**COZEN OCONNOR**
Valerie D. Rojas (State Bar No. 180041)
*vrojas@cozen.com*
601 S. Figueroa Street, Suite 3700
Los Angeles, CA 90017
Telephone: 213.892.7900
Facsimile: 213.892.7999

Attorneys for Plaintiff *Transamerica Life Insurance Company*

# UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| TRANSAMERICA LIFE INSURANCE COMPANY, <br><br> *Plaintiff,* <br><br> v. <br><br> VAROOJ ARAKELIAN, <br><br> *Defendant*. | Civil Action No.: <br><br> **PLAINTIFF TRANSAMERICA LIFE INSURANCE COMPANY'S COMPLAINT FOR DAMAGES AND DECLARATORY RELIEF** |

Plaintiff, Transamerica Life Insurance Company ("Transamerica"), as successor by merger to Transamerica Premier Life Insurance Company, acting by and through its counsel, the Cozen O'Connor law firm, files this complaint for damages and declaratory relief against Varooj Arakelian ("Arakelian"), and in support thereof, states the following:

## PARTIES

1. Transamerica is an insurance company organized and existing under the laws of the State of Iowa with its principal place of business in Cedar Rapids, Iowa, and is therefore deemed to be a citizen of the State of Iowa.

2. Arakelian is an adult individual residing in Glendale, California, and is a citizen of the State of California.

## JURISDICTION AND VENUE

3. Jurisdiction is proper in this Court pursuant to 28 U.S.C. § 1332, because the dispute is between citizens of different states and the amount in controversy exceeds the sum of $75,000.00, exclusive of interest and costs.

LEGAL\60870308\4

4. Venue is proper in the United States District Court for the Central District of California pursuant to 28 U.S.C. § 1391(b)(1) because the Central District of California is the judicial district in which Arakelian resides.

5. Venue is also proper in the United States District Court for the Central District of California pursuant to 28 U.S.C. § 1391(b)(2) because the Central District of California is the judicial district in which a substantial part of the acts and omissions giving rise to Transamerica's claims against Arakelian occurred.

## FACTS COMMON TO ALL COUNTS

6. This is an action in which Transamerica alleges fraud, civil theft and other causes of action against Arakelian in connection with a claim for benefits under a long-term care insurance rider issued by Transamerica.

7. Indeed, Arakelian is no stranger to fraudulent conduct. According to press release No. 20-045 appearing on the Department of Justice's webpage, Arakelian was sentenced to federal prison in 2020 after conspiring to defraud banks of $2.1 million by falsely appropriating "the identities of at least 11 dentists, opening sham dentist offices, and filing fraudulent claims to banks that offer lines of credit to dentists."

8. Arakelian represented to Transamerica for a full year that he was entitled to be paid benefits under the rider for care services he allegedly received in the home each day due to functional limitations from which he claimed to suffer.

9. In fact, the claim was a sham. Arakelian simply defrauded Transamerica of an amount equal to or greater than $24,698.99 of insurance benefits, plus additional unpaid premiums, in connection with the claim. He did this in at least two broad and sweeping ways, each of which independently qualifies as fraud under the law.

10. First, he represented to Transamerica that he meets the benefit eligibility triggers in the rider due to functional limitations that led him to require daily care from a caregiver in the home. In fact, Arakelian had no such functional limitations and did not require care in the home. He was fully aware that his representations to

2

Transamerica regarding his functionality were false. This was fraud.

11. Second, Arakelian represented to Transamerica in signed and certified Proof of Loss forms, care notes and other communications that he received and paid for care services from a caregiver in the home for approximately eight hours each day. He then sought benefits from Transamerica to reimburse him for the care he allegedly received and paid for. Arakelian's representations were false. In fact, Transamerica performed multiple periods of surveillance on Arakelian and his alleged caregivers. The surveillance was staggered over a period of months to ensure consistency. During the entirety of Transamerica's investigation, Arakelian was routinely seen active in the community. Yet, Arakelian's alleged caregivers were never once seen providing care to Arakelian, who clearly did not need care of any kind. This was fraud.

12. By knowingly misrepresenting facts concerning his functionality, alleged receipt of care services and payment for care, Arakelian fraudulently induced Transamerica to pay long-term care insurance benefits he was not lawfully entitled to receive.

**A.     The Insurance Coverage at Issue in this Action**

13. On or about July 25, 2018, Arakelian applied with Transamerica for a Flexible Premium Adjustable Life Insurance with an Index Account Option policy (the "Policy").

14. In connection with his application for the Policy, Arakelian also applied for a Comprehensive Long Term Care Insurance Rider (the "Rider"), which was to be appended to and incorporated within the Policy at issuance.

15. Arakelian's pattern and practice of fraudulent conduct began, and took root, before the Policy and Rider were even issued. Indeed, in the applications for these coverages, Arakelian knowingly and intentionally made false representations to Transamerica concerning a multitude of health issues, injuries sustained during a 2017 car accident and his ongoing tobacco use. Had Transamerica known the truth about these false representations, it would have declined to issue the Policy and Rider.

3

16. Unaware of the falsity of these representations, however, Transamerica Premier Life Insurance Company issued the Policy (No. 6600461423) with the Rider appended on August 23, 2018. A true and correct copy of the Policy and Rider, excluding the applications which contain personal health information as defined by the HIPAA statute, is attached hereto as **Exhibit A**. Transamerica Premier Life Insurance Company subsequently merged into Transamerica Life Insurance Company.

17. The Policy has a face amount of $292,008.00.

18. In the event of a legitimate benefit claim under the Rider, Arakelian would be entitled to draw down the Policy's $292,008.00 face amount by 2% each month in the form of Rider benefits.

19. The Rider provides coverage for Home Health Care Services – meaning "[s]killed nursing or other professional services provided where the Insured resides…" – in the event Arakelian meets the Rider's definition of a Chronically Ill Individual, among other requirements.

20. Chronically Ill Individual is defined in pertinent part to mean that Arakelian is "unable to perform, without **Substantial Assistance** from another individual, at least two out of the six **Activities of Daily Living (ADLs)**" defined in the Rider.

21. Substantial Assistance means Hands-On or Standby Assistance – *i.e.*, assistance from another person who is physically assisting or within arm's reach of Arakelian to prevent injury to Arakelian.

22. The ADLs defined in the Rider include Bathing, Continence, Dressing, Eating, Toileting and Transferring.

23. In the event Arakelian needs Hands-On or Standby Assistance from another person to perform two or more of the six ADLs defined in the Rider, the Rider will pay benefits to Arakelian provided Arakelian hires, receives care from and pays for the services of an approvable caregiver to assist with the performance of ADLs,

subject to the terms and conditions of the Rider and Policy.

24. Notably, benefits under the Rider are only triggered if Arakelian incurs actual expenses for care services rendered. This means that Arakelian needs to receive care in exchange for remuneration, then submit invoices and other Proof of Loss signed and certified by both Arakelian and his caregivers to Transamerica in order for benefits to be paid.

25. As with all insurance coverages, Arakelian is required to pay premium in order to keep the Policy and Rider in-force. Failure by Arakelian to pay premium timely will result in the Policy and Rider lapsing and terminating in accordance with their terms.

26. Notwithstanding the requirement that Arakelian pay premium to keep coverage in-force, however, the Rider contains two important provisions, a Lapse Protection provision and a Waiver of Rider Monthly Charges provision. Taken jointly, these provisions state that in the event of a legitimate claim for benefits under the Rider, Arakelian's premium obligation is waived during the pendency of the claim and neither the Policy nor Rider will lapse for nonpayment of premium.

**B.** **Arakelian's Claim for Benefits Under the Rider**

27. In or around September 2021, Arakelian initiated a claim for benefits under the Rider. He identified back, shoulder and knee pain (without hospitalization) as the basis for the claim. These infirmities, he alleged, arose when he inadvertently rolled off the top bunk of a bunk bed while incarcerated in federal prison in connection with the felony conviction discussed above.

28. Transamerica assessed Arakelian for benefits on March 22, 2022. The initial assessment was performed in Arakelian's home by an independent nurse-assessor who was not affiliated with Transamerica or Arakelian. Transamerica determined, based on Arakelian's representations to the independent nurse-assessor, that Arakelian was unable to perform three of six ADLs without Hands-On Assistance.

29. Arakelian additionally reported to Transamerica in connection with the assessment that he received six hours of paid care each day in the home beginning January 1, 2022; that he was never left alone; that he experienced significant pain and frequent falls; that, despite holding a driver's license, he could not drive a car due to his infirmities; and that he required and used a cane for ambulation.

30. Based on Arakelian's representations, Transamerica approved Arakelian's claim and began paying benefits to Arakelian under the Rider.

31. In accordance with the Rider's Lapse Protection and Waiver of Rider Monthly Charges provisions, premium for the Rider was waived due to the approval of the claim and neither the Policy nor Rider could lapse for nonpayment of premium.

C. **Arakelian's Submission of Signed and Certified Proof of Loss**

32. As a precondition to the payment of benefits under the Rider, Arakelian was required to (and did) submit signed and certified Proof of Loss to Transamerica.

33. The Proof of Loss submitted by Arakelian included daily caregiver notes with the dates and times each day when care was allegedly provided by his caregivers. The Proof of Loss also included a description of the specific care services allegedly provided by each caregiver; the total number of hours worked each day and week; the caregiver's hourly billing rate; and the total amount of money allegedly paid each day and week by Arakelian to his caregivers in exchange for care services rendered.

34. Moreover, every Proof of Loss form was signed and dated by both Arakelian and the caregiver whose claimed services were reflected in a given form. Each form included a certification by Arakelian and the caregiver that the information provided was true and complete.

35. Arakelian completed, certified, signed and submitted to Transamerica a Proof of Loss form with the information described above for every claimed date of care over the yearlong life of the claim. In other words, Arakelian made hundreds of discreet representations to Transamerica in which significant detail was given about the care services Arakelian allegedly received and paid for.

36. The Proof of Loss provided by Arakelian was essential to Transamerica's evaluation of the claim and payment of benefits. It was the means by which Transamerica was led to believe that care was, in fact, being provided and paid for. Absent the submission of Proof of Loss, Arakelian's claim would not have been paid.

37. Once Arakelian began submitting formal Proof of Loss forms to Transamerica in support of his claim, the amount of care services Arakelian claimed to receive each day jumped from six hours to eight hours. The amount of money he claimed to be paying each day to his caregivers similarly increased.

38. Upon information and belief, all Proof of Loss provided to Transamerica over the life of the claim was false, was known by Arakelian to be false, and was fabricated by Arakelian for the singular purpose of inducing Transamerica to pay his fraudulent claim.

### D. Transamerica's Claim Investigation

39. Beginning in 2022, Transamerica determined that it was necessary and appropriate to investigate Arakelian's claim for benefits.

#### 1. Transamerica's First Period of Surveillance

40. In May 2022, Transamerica performed an initial period of surveillance on Arakelian.

41. For each date of surveillance, Arakelian provided signed and certified Proof of Loss to Transamerica representing that he received and paid for approximately eight hours of care from a caregiver. These Proof of Loss submissions identified the specific dates and times when care was allegedly provided, along with a detailed description of the care services. Acting in reliance on these submissions, Transamerica paid benefits to Arakelian.

42. Transamerica's surveillance revealed that Arakelian was experiencing no functional limitation at all. He was active in the community. He was fully capable of performing all ADLs without assistance of any kind. He drove a car. He walked without any instability or gait issue. His movements were fluid. He used no cane or

walker. He showed no signs of pain or discomfort. And he was often alone.

43. The surveillance also revealed that Arakelian had represented to Transamerica in Proof of Loss submissions that he received paid care services on dates and at times when no care services were received. Indeed, despite Arakelian being active in the community during times when he was allegedly receiving care in the home, he was never seen in the presence of his alleged caregiver, let alone actually receiving care. In other words, Arakelian simply claimed benefits from Transamerica for care that was neither required nor provided.

### 2. Transamerica's Second Period of Surveillance

44. In June 2022, Transamerica performed a second period of surveillance.

45. For each date of surveillance, Arakelian provided signed and certified Proof of Loss to Transamerica representing that he received and paid for approximately eight hours of care from a caregiver. These Proof of Loss submissions identified the specific dates and times when care was allegedly provided, along with a detailed description of the care services. Acting in reliance on these submissions, Transamerica paid benefits to Arakelian.

46. Arakelian was not observed during the second period of surveillance. Nevertheless, the second period of surveillance definitively showed that Arakelian's fraud was ongoing. Transamerica observed Arakelian's alleged caregiver, a neighbor of Arakelian, departing his own home and remaining away from the home for protracted periods of time. Not once during the entire period of surveillance was the alleged caregiver seen with Arakelian, let alone entering or departing Arakelian's home or providing care.

47. Meanwhile, Arakelian completed, signed, certified and submitted to Transamerica Proof of Loss forms in which he claimed that he was receiving paid services in the home from his alleged caregiver on dates and at times when Transamerica's video demonstrated that the two men were not in the same location. Arakelian simply claimed benefits from Transamerica for care that was neither needed

nor received.

### 3. Arakelian Undergoes an Independent Medical Evaluation

48. Transamerica determined that it was necessary and appropriate to schedule Arakelian for an independent medical evaluation ("IME") in accordance with Transamerica's rights under the Rider.

49. The IME took place on September 1, 2022 with Dr. Katrina Vlachos, who is board certified in Physical Medicine & Rehabilitation and had no prior relationship with Arakelian or Transamerica.

50. Arakelian presented for the IME being wheeled in a wheelchair, carrying a cane and donning a knee brace. He claimed to be in significant pain and to be experiencing material functional deficits. His claimed functional deficits included, in particular, an inability to perform three ADLs without Hands-On Assistance from a caregiver. Due to these alleged ADL limitations, Arakelian represented to Dr. Vlachos that he required and received between six and eight hours of paid care services in the home each day.

51. Based largely on Arakelian's subjective representations during the IME, Dr. Vlachos initially opined that Arakelian might require assistance to perform one ADL and was borderline with two others. She further opined that, at most, Arakelian would require one-and-a-half hours of care per day rather than the six-to-eight hours Arakelian claimed.

52. In consideration of Dr. Vlachos' opinion, Transamerica continued to pay benefits while it investigated the claim further.

### 4. Transamerica's Third Period of Surveillance

53. Transamerica performed a third period of surveillance in August and September 2022, including the date of the IME and dates before and after the IME.

54. For each date of surveillance, Arakelian provided signed and certified Proof of Loss to Transamerica representing that he received and paid for eight hours of care from a caregiver. These Proof of Loss submissions identified the specific dates

and times when care was allegedly provided, along with a description of the care services. Acting in reliance on these submissions, Transamerica paid benefits to Arakelian.

55. Transamerica's surveillance reconfirmed that Arakelian was experiencing no functional limitation at all. Its observations tracked the first period of surveillance. Arakelian was active in the community. He was fully capable of performing all ADLs without assistance of any kind. He drove a car. He used no cane or walker, let alone a wheelchair. He walked with no limp or gait instability. He exhibited no signs of pain or discomfort.

56. Moreover, almost comically, immediately after driving home from the September 1, 2022 IME, Arakelian was observed on video retrieving from the trunk of his car the very same cane and wheelchair cushion he had just used during the IME, then carrying those implements into his home. He clearly did not need (and did not actually use) the implements. Rather, they were theatrical props he obtained to give Dr. Vlachos the false impression that he was experiencing ADL limitations when in fact, he was not.

57. Moreover, the surveillance once again revealed that Arakelian had represented to Transamerica in Proof of Loss submissions that he received paid care services on dates and at times when no care services were received. Indeed, despite Arakelian being active in the community during times when he was allegedly receiving care in the home, he was never seen in the presence of a caregiver, let alone actually receiving care. In other words, Arakelian simply claimed benefits from Transamerica for care that was neither required nor provided.

### 5. Transamerica's Fourth Period of Surveillance

58. Transamerica performed a fourth period of surveillance in September 2022.

59. This final period of surveillance was performed in connection with a request by Arakelian that Transamerica evaluate the eligibility of yet another of his neighbors to become one of his paid caregivers.

60. Arakelian represented during this evaluation, which was conducted in-person in Arakelian's home, that the caregiver was providing paid care eight hours per day, seven days per week, and assisted Arakelian with the performance of all ADLs except Continence. These representations were documented in written submissions to Transamerica, and were later tracked by Proof of Loss submissions signed and certified by Arakelian.

61. Yet, shortly after the evaluator departed Arakelian's home, Arakelian and the putative caregiver were observed on video standing outside Arakelian's home talking for a protracted period of time. The supposed caregiver then returned to his own home and the two men were not seen together again despite reporting to Transamerica that care was being provided.

62. Meanwhile, Arakelian went about his day in a normal and unassisted fashion, doing things like walking and smoking cigarettes outside alone, then taking out the trash. He was never assisted by another person and clearly did not need assistance of any kind.

### 6. Dr. Vlachos' IME Addendum

63. Due to the substantial disconnect between Arakelian's reported functionality and the level of functionality seen on video, Transamerica provided its video to Dr. Vlachos so she would have the benefit of all available information concerning Arakelian's reported functional limitations.

64. Transamerica asked Dr. Vlachos whether the video changed the opinions rendered in her initial written IME report. Dr. Vlachos confirmed that the individual appearing in Transamerica's video was Arakelian, and that the video changed her opinion significantly.

65. On November 5, 2022, Dr. Vlachos prepared a detailed addendum to her initial IME report. The addendum walked through the many reasons why Arakelian's representations and behaviors at the IME were not indicative of his true functionality, but were merely a contrivance intended to deceive Transamerica. Dr. Vlachos retracted in full her initial opinion and issued a new conclusion that Arakelian requires no assistance with any ADL nor any care in regard to the same.

### 7. Transamerica Closed its Investigation

66. Based on all information in its possession, Transamerica closed its investigation and determined that Arakelian had, in fact, engaged in fraud.

67. Transamerica has paid Arakelian an amount equal to or greater than $24,698.99 in benefits over the life of the claim. Upon information and belief, all of those benefits were paid as a direct result of Defendants' fraud and are subject to recovery in this lawsuit.

68. Transamerica also waived an additional amount of premiums over the life of the claim by operation of the Lapse Protection and Waiver of Rider Monthly Charges provisions, which Arakelian caused to be triggered by his fraud. These premium amounts are subject to recovery in this lawsuit.

69. Arakelian's conduct was protracted and egregious, and was of such a nature that it shocks the conscience and justifies an award of punitive damages in addition to compensatory damages.

70. Moreover, Transamerica is entitled to a declaration that the Policy and Rider are void under the inherent power of the Court to adjust the equities between the parties due to: (a) the constructive lapse of the Policy and Rider; (b) Arakelian's breach of the implied covenant of good faith and fair dealing between the parties; (c) as a means of compensating Transamerica for a portion of its losses; and (d) in accordance with California black letter law.

## COUNT I – FRAUD

71. Transamerica incorporates the preceding paragraphs of the complaint as though set forth fully herein.

72. Arakelian did knowingly and intentionally misrepresent, or cause to be misrepresented, material facts to Transamerica as described in this Complaint, in the following ways:

    a. Creating and perpetuating the false impression that caregivers provided care to Arakelian on dates and at times when, in fact, no care was provided;

    b. Creating and perpetuating the impression that Arakelian was unable to perform two or more ADLs without Substantial Assistance when, in fact, he was fully capable of performing all ADLs;

    c. Creating and perpetuating the false impression that Arakelian's care needs, if any, were greater than they were in-fact;

    d. Creating and perpetuating the false impression that caregivers provided specific kinds of care services to Arakelian when, in fact, they did not do so;

    e. Creating and perpetuating the false impression that Arakelian compensated his putative caregivers for their alleged services in the amounts represented to Transamerica when, in fact, they were not compensated as represented to Transamerica, if at all.

73. Arakelian made and perpetuated these misrepresentations repeatedly over a continuous period more approximately a year with knowledge of their falsity.

74. Arakelian made and perpetuated these misrepresentations with knowledge and intent that the false information would be relied upon by Transamerica for his benefit and to Transamerica's detriment.

75. Transamerica relied on Arakelian's misrepresentations and was justified in its reliance.

76. As a direct and proximate result of Arakelian's fraudulent misrepresentations, Transamerica was harmed by paying benefits in an amount equal to or greater than $24,698.99 that Arakelian was not lawfully entitled to receive and by waiving premium in an additional amount that ought to have been paid.

77. Transamerica incurred additional losses in an amount to be determined at trial relating to its cost of investigating the claim.

## COUNT II – CIVIL THEFT

78. Transamerica incorporates the preceding paragraphs of the complaint as though set forth fully herein.

79. Arakelian knowingly and intentionally deprived Transamerica of insurance benefits in an amount equal to or greater than $24,698.99 that should not and would not have been paid but for his fraud and deceit, plus premiums that ought to have been paid in an additional amount but for his fraud and deceit.

80. Arakelian had no lawful right to receive this money, or to retain possession of the money once it was received.

81. Notwithstanding the absence of any right to receive or retain possession of the money, Arakelian did, in fact, receive and retain possession of the money.

82. Arakelian's receipt and retention of the money constituted a theft.

83. Defendants knew that the money was received and retained through fraud and deceit, and that Transamerica would not have paid the money had it known the true facts about Arakelian's claim at the inception of the claim. Thus, Defendants knew the money they received from Transamerica or else withheld was stolen.

84. As a result of this theft, Arakelian is liable to Transamerica in an amount equal to or greater than $24,698.99, plus unpaid premiums, plus interest, statutory treble damages, fees and costs.

## COUNT III – RESTITUTION OF BENEFITS PAID

85. Transamerica incorporates the preceding paragraphs of the complaint as though stated fully herein.

86. Transamerica has no present obligation to pay benefits under the Rider due to one or more of: (1) Arakelian's lack of a qualifying ADL deficiency; (2) Arakelian's failure to receive care from any caregiver; (3) Arakelian's failure to receive the care represented to Transamerica; (4) Arakelian's failure to pay for the care he received, if any; and/or (5) Arakelian's failure to compensate his caregivers in the amounts represented to Transamerica.

87. Transamerica had no obligation to pay benefits under the Policy during some or all of the period of Arakelian's claim due to one or more of: (1) Arakelian's lack of a qualifying ADL deficiency; (2) Arakelian's failure to receive care from any caregiver; (3) Arakelian's failure to receive the care represented to Transamerica; (4) Arakelian's failure to pay for the care she received, if any; and/or (5) Arakelian's failure to compensate his caregivers in the amounts represented to Transamerica.

88. Because Transamerica has made an overpayment of benefits, Transamerica is entitled to restitution in the amount of the benefits paid by Transamerica since a date to be determined by the Court.

## COUNT IV – NEGLIGENCE

89. Transamerica incorporates the preceding paragraphs of the complaint as though set forth fully herein.

90. Arakelian had an ongoing duty to provide true and correct information to Transamerica concerning Arakelian's functionality, claim for benefits under the Rider, alleged receipt of and payment for care.

91. By providing false information to Transamerica as described in this Complaint, Arakelian breached his duty to Transamerica.

92. Transamerica reasonably relied to its detriment on the false information supplied by Arakelian, paying insurance benefits Arakelian was not lawfully entitled to receive.

93. Thus, the false information supplied by Arakelian to Transamerica both caused and proximately caused harm to Transamerica.

94. Transamerica was damaged in an amount equal to or greater than $24,698.99, which Transamerica would not have paid but for Arakelian's submission of false information. Transamerica additionally waived premiums that ought to have been paid.

## COUNT V – DECLARATION THAT THE POLICY AND RIDER ARE VOID

95. Transamerica incorporates the preceding paragraphs of the complaint as though set forth fully herein.

96. The Policy and Rider should be declared void by the Court for a total of four reasons.

### Declaration that the Policy and Rider Constructively Lapsed and Terminated

97. As discussed, Arakelian was required to pay premium for the Policy and Rider to remain in-force. If Arakelian failed to pay premium timely, the Policy and Rider would lapse and terminate.

98. The Rider included Lapse Protection and Waiver of Rider Monthly Charges provisions. By operation of these provisions, Arakelian was not required to pay premium during the pendency of a *legitimate* claim for benefits because his premium obligation was waived.

99. By initiating and perpetuating a fraudulent claim for benefits against Transamerica as described in this Complaint, Arakelian triggered the Lapse Protection and Waiver of Rider Monthly Charges provisions fraudulently, meaning Arakelian

failed to pay the premium required for the Policy and Rider to remain in-force during the pendency of the claim as a direct and proximate result of his fraud.

100. But for Arakelian's fraud, the Lapse Protection and Waiver of Rider Monthly Charges provisions would not have been triggered and the Policy and Rider would have lapsed and terminated due to Arakelian's nonpayment of premium during the claim.

101. Arakelian is estopped to claim the protections of the Lapse Protection and Waiver of Rider Monthly Charges provisions because his claim was fraudulent and the Lapse Protection and Waiver of Rider Monthly Charges provisions were triggered fraudulently. Indeed, Arakelian was obligated to pay premium during the pendency of the claim but did not do so.

102. Transamerica is therefore entitled to a judicial declaration that the Policy and Rider constructively lapsed and terminated due to Arakelian's nonpayment of premium during the pendency of the fraudulent claim.

103. In the alternative, Transamerica seeks and is entitled to a judicial declaration that the Policy and Rider are void under the inherent power of the Court to adjust the equities between the parties for three additional reasons, discussed below.

**Declaration that the Policy and Rider are Void Due to Arakelian's Bad Faith and to Protect Transamerica from Future Harms**

104. First, it is necessary and appropriate for the Court to exercise its inherent power to adjust the equities between the parties by declaring the Policy and Rider void so Transamerica is not forced to remain in contractual privity with a party who has acted in bad faith and may attempt to commit additional frauds against Transamerica in the future.

105. Insurance contracts are agreements *uberrimae fidei* and are undergirded by a mutual implied covenant of good faith and fair dealing.

106. By initiating and perpetuating a protracted fraud against Transamerica, Arakelian has breached the implied covenant and demonstrated that he is incapable

of proceeding in good faith in an ongoing contractual relationship with Transamerica. Transamerica should be protected by the Court from the prospect of future frauds by Arakelian.

**Declaration that the Policy and Rider are Void Under**

**the Inherent Power of the Court to Adjust Equities to Compensate**

**Transamerica for a Portion of Its Losses**

107. Second, it is necessary and appropriate for the Court exercise its equitable powers to declare the Policy and Rider void as a means of compensating Transamerica for a portion of the losses attributable to Arakelian's fraudulent conduct.

**Declaration that the Policy and Rider are Void Under**

**California Black Letter Law**

108. And, third, Transamerica is entitled to a declaration that the Policy and Rider are void under California black letter law, including:

    a.     Cal. Civ. Code § 3412, due to Arakelian's fraud and, as a result, Transamerica's reasonable apprehension of serious injury, including additional pecuniary loss, or the prejudicial alteration of Transamerica's position, in the event Transamerica is required to remain in contractual privity with Arakelian;

    b.     Cal. Civ. Code § 1689, because the Policy and Rider are unlawful for causes that do not appear in their terms or conditions; and because the public interest will be prejudiced by permitting the Policy and Rider to stand; and/or

    c.     c)     Cal. Ins. Code § 359, which requires the Policy and Rider to be voided as of the earliest date on which Arakelian misrepresented any material fact to Transamerica concerning the claim.

109. There is an actual, present and justiciable controversy between the parties as to whether the Policy and Rider are void for which there is no adequate remedy at law.

**WHEREFORE**, Transamerica respectfully demands the following relief:

1. Actual and compensatory damages in an amount to be determined at trial, plus interest;
2. Punitive damages;
3. Statutory treble damages;
4. Attorney's fees;
5. The costs of litigation;
6. A judicial declaration that the Policy and Rider are void;
7. A judicial declaration that Transamerica may retain some or all of the premium paid for the Policy and Rider;
8. Restitution of benefits paid under the Rider since a date to be determined by the Court;
9. Such other relief as may be demonstrated at trial; and
10. Such other relief as the Court deems just and proper.

Respectfully Submitted,

COZEN O'CONNOR

Dated:  12/29/2022         By: _/s/ Valerie D. Rojas_
                               Valerie D. Rojas
                               ***Attorneys for Plaintiff***
                               ***Transamerica Life Insurance Company***